# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM ANTHONY FISCUS,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:13-cv-01901-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff William Anthony Fiscus, by his attorneys, Law Offices of Binder and Binder, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II and for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge.

Plaintiff alleges that the Commissioner erred in rejecting the opinions of Dr. Caviale, an orthopedic surgeon, and Dr. Rhoades, a pain management specialist.  Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

///

I.  **Procedural History**

On June 3, 2010, Plaintiff filed an application for disability insurance benefits.  On August 31, 1010, he filed an application for supplemental security income.  In both applications, Plaintiff alleged disability beginning January 1, 2009.   The Commissioner initially denied the claims on October 14, 2010, and upon reconsideration, on May 4, 2011.  On May 25, 2011, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on April 5, 2012.  George A. Meyers, an impartial vocational expert, also appeared and testified.  At the hearing, Plaintiff amended his alleged onset date and requested a closed period of disability from July 8, 2007, through April 1, 2011.

On May 1, 2012, Administrative Law Judge Trevor Skarda denied Plaintiff's application.  The Appeals Council denied review on September 25, 2013.  On November 21, 2013, Plaintiff filed a complaint seeking this Court's review.

II.  **Factual Background**

Plaintiff (born November 14, 1959) worked as a mechanic for a heating and air conditioning firm whose business includes constructing semiconductor wave furnaces and fabricating plastics and robotics.  His job required lifting five to 200 pounds, alone or with another worker.  Plaintiff testified that he lifted fifty to sixty pounds for about a third of his working day, but needed to avoid using his left palm when he lifted.  He stood and walked about ninety percent of the workday.  Plaintiff testified that he could not have performed his job in 2008 when he had no use of his left hand, particularly the ring and little finger and the palm.

Plaintiff was able to drive to work and shopping, primarily using his right hand to control the steering wheel.  His residence did not require any gardening or yard maintenance.

Until the age of eighteen, Plaintiff was left-hand dominant.  After a workplace accident in which he cut the fingers of his left hand, traumatically amputating the middle finger, Plaintiff became primarily right-handed.

In 2007, Plaintiff was placed on workers' compensation for problems with his left hand and arm, which included difficulty opening and closing his hand and bending the elbow.  Thereafter,

Plaintiff incurred five surgeries, none of which was completely successful. Plaintiff returned to work after his state disability ran out on August 23, 2010. At the time of the hearing, Plaintiff's treatment concentrated on pain management. His medications included Oxycodone and Flexeril.

In a pain questionnaire completed June 30, 2010, Plaintiff reported constant pain and numbness of his left hand and elbow. He had no difficulty walking, standing, or sitting. He could perform simple cooking but needed help with sweeping and mopping floors and some cooking.

**Medical records.** In March or April 2007, Plaintiff began to notice numbness in his left hand and pain in his left elbow. Initially, he assumed that he had slept wrong. Eventually, he was treated by Stephen F. Corcoran, M.D., who diagnosed left carpal and cubital syndrome attributable to cumulative trauma and performed surgery on April 16, 2008.

Hand and wrist surgeon Leonard Gordon, M.D., prepared the first of several medical-legal evaluations for workers compensation on February 21, 2008. Dr. Gordon attributed Plaintiff's condition to his history of performing repetitive, strenuous work with his hands, using manual and power tools. The condition of Plaintiff's left upper extremity was unrelated to previous treatment of carpal tunnel syndrome of Plaintiff's right upper extremity or to the earlier occupational accident that injured the fingertips of Plaintiff's left hand. Dr. Gordon opined that Plaintiff would require surgery to address his carpal and cubital tunnel syndromes. On March 31, 2008, Dr. Gordon confirmed that Plaintiff, who had been off work since July 25, 2007, was temporarily totally disabled for workers' compensation purposes.

By May 1, 2008, Plaintiff's wounds had healed well, although numbness remained in his little finger. Dr. Corcoran referred Plaintiff for occupational therapy and authorized his return to work on June 30, 2008.

Dr. Gordon again conducted a workers' compensation evaluation on October 29, 2008, reporting that the severe problems continued in Plaintiff's left upper extremity. Plaintiff reported little improvement following surgery and continued severe symptoms in his left elbow and wrist. Dr. Gordon's examination revealed markedly decreased sensation in the little finger, inflammation and tenderness of the carpal tunnel release scar on Plaintiff's left wrist, exquisite tenderness over the ulnar nerve, moderate tenderness of the lateral epicondyle, marked tenderness of the medial

3

1  epicondyle, a markedly positive Tinel's sign, exquisite tenderness of the median nerve at the left
2  wrist, and extreme tenderness of the left elbow incision over the cubital tunnel.

3  Dr. Gordon opined that further surgery was needed to take pressure off the nerve and to
4  correct the sensitivity and ulnar nerve exposure at the cubital tunnel.  If the median nerve did not
5  become less sensitive with time, a palmaris brevis flap might be advisable.  Although pain
6  management services could alleviate pain, surgical correction would be necessary to resolve the left
7  elbow pathology.

8  Sanjay Patel, M.D., performed a physical medicine and rehabilitation consultation on
9  December 4, 2008.  Finding that Plaintiff's condition was worse after surgery, Dr. Patel
10 recommended further treatment by an orthopedist specializing in hand surgery.  Dr. Patel also
11 initiated medical treatment for Plaintiff's neuropathic pain and swelling.

12 Orthopedist John S. Holmes, M.D., examined Plaintiff on January 20, 2009.  Dr. Holmes
13 observed tenderness of the ulnar nerve at the left medial elbow with a positive Tinel's sign,
14 decreased sensation in the left little finger, and tenderness of the carpal tunnel release scar.  He
15 concurred in Dr. Gordon's opinion that further surgery was needed.

16 On March 26, 2009, Dr. Holmes diagnosed ulnar nerve neuritis of the left elbow.  He noted a
17 "very positive Tinel's sign over the ulnar nerve at the medial left elbow."  Considering the symptoms
18 a post-operative problem, Dr. Holmes referred Plaintiff to hand surgeon Paul A. Caviale, M.D.

19 After examining Plaintiff on July 15, 2009, Dr. Caviale diagnosed left ulnar neuropathy, left
20 carpal tunnel syndrome, and possible injury to the medial antebrachial cutaneous nerve branch in the
21 left elbow.  He recommended radiography and nerve conduction studies, to be followed by a left
22 carpal tunnel release with a palmar brevaris flap, exploration of the ulnar nerve at the left elbow, and
23 exploration of cutaneous nerves, with possible resection of neuroma and submuscular transposition
24 of the ulnar nerve.  Following electromyography conducted by Gary W. Platt, M.D., which revealed
25 that Plaintiff's median nerve and medial antebrachial cutaneous nerve were normal, Dr. Caviale
26 canceled plans to perform palmaris brevis flap surgery.

27 Dr. Caviale performed ulnar nerve release with submuscular transposition on September 25,
28 2009. By October 5, 2009, Dr. Caviale removed the stitches and reported only modest improvement

in the hand parathesia, but no pain over the ulnar nerve. On October 27, 2009, the doctor reported that the wound was well-healed and parathesia in the ring and little fingers had improved, but Plaintiff remained symptomatic. Dr. Caviale recommended that Plaintiff remain off work for six more weeks. Plaintiff also received physical therapy. On December 7, 2009, Dr. Caviale noted that as a result of the physical therapy, paresthesia had returned to Plaintiff's little finger.

On November 25, 2009, Dr. Gordon again prepared a workers' compensation evaluation. Plaintiff still experienced pain and swelling from surgery and was still receiving physical therapy. The doctor opined that Plaintiff required continued therapy to regain strength and should remain on temporary disability for approximately six more months.

On January 18, 2010, Plaintiff was experiencing little elbow pain and no numbness in his ring and little fingers, but had developed substantial pain in the palm of his left hand. Dr. Caviale recommended palmaris brevis flap surgery, which he performed on February 12, 2010.

On January 25, 2010, Dr. Caviale completed a work ability form for Plaintiff's attorneys. He opined that sitting, standing, walking, driving, bending, squatting, and kneeling were unrestricted. Although Plaintiff's left hand was restricted from repetitive simple grasping, pushing, pulling, and fine manipulation, Plaintiff was able to perform light duty work.

On February 24, 2010, Dr. Caviale reported parethesis of the little finger and the ulnar half of Plaintiff's palm. He instructed Plaintiff to return to work in six weeks.

On April 12, 2010, Plaintiff told Dr. Caviale that he had less paresthesia of the little finger but had a burning sensation in the palm of his hand.

On June 3, 2010, Dr. Caviale suggested that paresthesia in Plaintiff's little finger could be relieved by exploratory surgery to excise a neuroma or release a constricting band affecting the ulnar digital nerve to the little finger. He performed the surgery on July 9, 2010, excising a neuroma.

On September 20, 2010, Dr. Caviale noted "markedly diminished sensibility on the ulnar half of the little finger" and needles and pins in the palm of Plaintiff's hand when the volar pulp of the little finger was tapped.

Medical consultant K. Quint, M.D., prepared a physical residual functional capacity assessment on October 7, 2010. Dr. Quint opined that Plaintiff could occasionally lift fifty pounds

and frequently lift 25 pounds; stand, walk, and sit six hours in an eight-hour work day; occasionally push and pull with left upper extremity; and frequently finger, handle, and lift overhead with his left upper extremity.

Dr. Gordon again evaluated Plaintiff on November 10, 2010. He noted that following his multiple surgeries, Plaintiff had developed a "fairly severe causalgia or complex regional pain syndrome" involving the ulnar nerve at his left wrist. Dr. Gordon recommended electro-diagnostic study and an MRI to fully assess Plaintiff's condition, as well as desensitization therapy and treatment by a pain management doctor. In Dr. Gordon's opinion, Plaintiff's condition would not be stabilized for approximately six months and return to his prior work as a fabricator was unlikely. On January 17, 2011, Dr. Gordon reported that the MRI did not reveal the reason for Plaintiff's very sensitive ulnar nerve. On February 7, 2011, Dr. Gordon reported that the electro-diagnostic study suggested that a problem in Plaintiff's lower cervical spine could be the cause or an aggravation of Plaintiff's wrist and finger pain.

Medical consultant Charles Fracchia, M.D. prepared a physical residual functional capacity assessment dated April 12, 2011. Dr. Fracchia opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, and sit six hours in an eight-hour work day; occasionally crawl; never climb ropes, ladders, or scaffolds. Plaintiff was limited to occasional pushing and pulling with his left upper extremity. Handling and fingering with the left upper extremity was limited. Dr. Fracchia gave great weight to Dr. Gordon's workers' compensation evaluations.

On March 9, 2011, Plaintiff began receiving treatment from pain management specialist Patrick Rhoades, M.D.

On June 11, 2011, Dr. Caviale completed a bilateral manual dexterity impairment questionnaire for Plaintiff's attorneys. He diagnosed Plaintiff as having reflex sympathetic dystrophy of the left wrist and left carpal tunnel syndrome, including pain, tingling, reduced grip strength, tenderness, redness, swelling, loss of sensation, and loss of fine coordination. Plaintiff experienced constant sharp, lancinating pain, exacerbated by gripping, from the base of the left palm

///

6

to the tip of the little finger. In Dr. Caviale's opinion, medication could not fully relieve the pain without unacceptable side effects.

Dr. Caviale opined that Plaintiff could occasionally lift and carry five pounds or less. Pain would increase in jobs requiring significant repetitive reaching, handling, and fingering. Although Plaintiff could not work with his left hand, he was capable of performing a full time competitive job that requires activity on a sustained basis.

On September 29, 2011, while using a table saw at work, Plaintiff traumatically amputated the tip of his left ring finger and injured a distal fracture. He was treated by John Giddens, M.D., at Fremont Urgent Care. On September 30, 2011, Dr. Rhoades treated Plaintiff for pain described as constant aching, but allowed Plaintiff to continue his regular work.

On December 15, 2011, Dr. Rhoades opined that Plaintiff's diagnosis was carpal tunnel syndrome with neuropathy. After a temporary trial, Plaintiff experienced relief of the neuropathy with pain and complex regional pain syndrome of his left upper extremity when using a cervical dorsal column stimulator. As a result, Dr. Rhoades recommended placement of a permanent spinal cord stimulator implant. Dr. Rhoades opined that Plaintiff was permanently disabled.

Dr. Rhoades also completed a bilateral manual dexterity impairment questionnaire for Plaintiff's attorneys. He diagnosed Plaintiff as having left wrist and hand pain and carpal tunnel syndrome, supported by EMG/nerve conduction studies in 2007. Dr. Rhoades opined that with his current regimen of treatment and medication, Plaintiff's prognosis was fair. Plaintiff experienced reduced grip strength, tenderness, and swelling in his left hand and had significant limitations in repetitive reaching, handling, fingering, or lifting. According to Dr. Rhoades, Plaintiff also had marked limitations bilaterally in grasping, twisting, fine manipulation, and reaching. He needed to avoid pushing, pulling, kneeling, bending, stooping, heights, wetness, and temperature extremes. Plaintiff could not perform a job that required activity on a sustained basis. Plaintiff required fifteen-minute breaks every thirty minutes and was likely to miss work more than three times monthly. His limitations would last at least twelve months.

///

///

1   In a report dated February 1, 2012, Dr. Gordon noted that Plaintiff's fractured finger had
2   healed and was not tender.  Plaintiff had a nerve stimulator placed the day before; its efficacy would
3   be apparent following three to four months of stabilization.

4   **Vocational expert testimony.**  Vocational expert George A. Meyers categorized Plaintiff's
5   past work as heating/air conditioning repairer installer, DOT # 637.261-014, medium, skilled, SVP
6   7, and electronic production line maintenance mechanic, 629.261-022, medium, skilled, SVP 7.  He
7   performed these jobs as heavy work.  His current work was best categorized as electronics utility
8   worker, DOT # 726.364-018, light, skilled, SVP 5, although Plaintiff performed his current job as
9   heavy work.

10  For the first hypothetical question, the ALJ directed Meyers to assume a hypothetical person
11  of the same age, education, and work background as Plaintiff, who was limited to light work; could
12  occasionally push, pull, handle, and finger with the left upper extremity; could occasionally crawl;
13  but could never climb ladders, ropes, or scaffolds.  Meyers opined that the hypothetical person could
14  not perform Plaintiff's past work but could perform jobs such as electronic inspector (DOT #
15  726.684-022, semi-skilled, SVP 3, 7000 jobs in California); counter clerk (DOT # 249.366-010,
16  light, unskilled, SVP 2, 2500 jobs in California), and host (DOT # 349.667-014, light, unskilled,
17  SVP 2, 4000 jobs in California).

18  For the second hypothetical question, the ALJ directed Meyers to assume the hypothetical
19  person described in the first hypothetical who could still lift ten pounds frequently and twenty
20  pounds occasionally but could use his non-dominant left hand only as an assist.  Meyers opined that
21  the hypothetical person could still perform the host position but that only 2000 jobs would be
22  available in California.  The hypothetical person could also perform the job of amusement park
23  attendant (DOT # 342.357-010, light, unskilled, SVP 2, with 750 jobs available).

24  For the third hypothetical question, the ALJ directed Meyers to assume a hypothetical
25  person of the same age, education, and work background as Plaintiff, who could occasionally lift and
26  carry up to five pounds; could never lift or carry five to ten pounds; was precluded from grasping
27  bilaterally, using fingers or hands for fine manipulations bilaterally, and using arms for reaching
28  overhead bilaterally; would take unscheduled breaks of up to thirty minutes; and would miss work

8

more than three times monthly.  Meyers opined that no work would be available for the third hypothetical person

## III. Discussion

### A. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

> Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had engaged in substantial gainful activity from April 1, 2011 through the date of decision.  Accordingly, he analyzed the closed period in excess of twelve months in which Plaintiff was not engaged in substantial gainful activity.  His severe impairments were left

carpal tunnel syndrome, status post two releases; history of left ulnar neuritis at the elbow, status post two ulnar nerve transposition; and causalgia of the left ulnar nerve, status post neurolysis of the left ulnar nerve and repair of neuroma. The ALJ specifically found Plaintiff's heartburn, obesity, and anxious mood not to be severe. None of these impairments or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). Plaintiff was able to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.957(b); to occasionally push or pull with his left upper extremity; occasionally crawl; occasionally handle and finger with his left upper extremity; and to use his left, non-dominant hand as an assistant only. Plaintiff could never climb ladders, ropes, or scaffolds. During his period of disability, Plaintiff was unable to perform any past relevant work. Nonetheless, jobs that Plaintiff could perform existed in significant numbers in the national economy. Accordingly, the ALJ concluded that Plaintiff was not disabled from July 8, 2007, through the date of the decision.

### B.     Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510

(9th Cir. 1987). "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### C. Plaintiff's Credibility

Plaintiff objects to the ALJ's findings that his testimony was not fully credible, arguing that the findings on credibility were not supported by clear and convincing evidence. The Commissioner disagrees, emphasizing that an ALJ cannot find disability on a sole basis of a claimant's subjective testimony.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

References to credibility can be troubling to claimants since, as the quotation from *Smolen* indicates, poor credibility may reflect untruthfulness or a lack of candor.  In reviewing the record in this case, the Court saw nothing that would have supported a conclusion that Plaintiff was lying or misrepresenting his condition as he perceived it.  Nonetheless, Plaintiff's subjective account of his condition was not fully consistent with the medical evidence in the record.  The disparity between the medical records and Plaintiff's representations is exacerbated by Plaintiff's natural tendency to view the situation in terms of his ability to continue to perform the skilled and semiskilled, but heavy, work he had done for most of his working life despite the legal measure of disability, which considers a claimant's ability to perform any substantial gainful work.  A claimant's severe impairment must not only preclude him from performing his previous work, it must prevent him from engaging in any other substantial gainful work existing in the national economy.  *Quang Van Han*, 882 F.2d at 1456.

Plaintiff testified that he was taken off work in 2007 when his left hand would cramp in a closed position and he was unable to open it.  At the same time, he was experiencing difficulty bending his elbow.  As detailed in the Factual Background above, Plaintiff then received treatment through workers' compensation, including five hand surgeries, none of which fully resolved Plaintiff's condition.  Although his pain had not changed from 2007 to 2012, the surgery performed by Dr. Cavielli enabled Plaintiff to move his elbow and placement of the spinal stimulator greatly improved movement of his finger.  AR 52.  By modifying the way he held things, Plaintiff was again able to work at the time of the 2012 hearing.  AR 52.  In contrast, Plaintiff testified that he would have been unable to work in 2008 since he had "no use of the little finger or the inside of the ring finger or the, the palm of the hand, the left hand at all."  AR 53.  That Plaintiff was unable to perform his heavy work as an assembler or mechanic is unquestionable, but the appropriate measure in an action for disability benefits is whether Plaintiff was unable to perform any available substantial gainful work during the closed period that is the subject of this case.

The concluding paragraph of section 7 of the administrative decision reflects the ALJ's applying the appropriate standard:

12

> In sum, the claimant's testimony is not consistent with the treatment record, which supports only partial, left-upper extremity limitations. As he had full use of his right, upper extremity, the claimant could be able to perform at least the lifting and carrying restrictions required in light work. He had some grip strength, some sensation, and partial range of motion throughout his left upper, extremity and, therefore, was only partially precluded in its use. For all these reasons, when the evidence is considered as a whole, the undersigned finds that the claimant could perform light work. He could occasionally push or pull with his left, upper extremity. He could never climb ladders, ropes, or scaffolds. He could occasionally crawl. He could occasionally handle and finger, with his left, upper extremity. He could use his left, non-dominant hand as an assist only.

AR 29.

The ALJ's conclusion is fully supported by substantial evidence in the record. *See* Factual Background *above*.

The ALJ did not err in finding that the credibility of Plaintiff's subjective testimony was undermined by the objective medical evidence.

### D.      **Opinions of Drs. Caviale and Rhoades**

Plaintiff contends that the ALJ erred in rejecting the opinions of treating physicians Caviale and Rhoades. The Commissioner responds that the ALJ appropriately rejected those opinions as inconsistent with the objective medical evidence.

Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "An ALJ is not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S.S.R. 96-5p.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] not treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nontreating physician. *Id.*

13

The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of the medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record and (2) clinical findings support the opinions. The ALJ may reject an *uncontradicted* opinion of a treating or examining physician only for clear and convincing reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings, the ALJ may resolve the conflict.

An ALJ must determine a claimant's residual functional capacity based on "all relevant evidence in the record." *Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence, and make a finding. *Magallanes*, 881 F.2d at 751-55. The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751. Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). The ALJ must tie the objective factors of the record as a whole to the opinions and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). The ALJ's evaluation of Plaintiff's application for benefits complied with these guidelines.

Because the problems associated with Plaintiff's left upper extremity was not simply solved by his first injury, Plaintiff was examined, evaluated, and treated by multiple physicians authorized by his employer's workers' compensation carrier. The ALJ first considered the work excuses and

14

1 findings of temporary disability rendered by Dr. Gordon, Dr. Corcoran, Dr. Caviale, Dr. Rhoades,
2 and Nurse-Practitioner Ramoa, finding these to be inconsistent and noting that Dr. Corcoran actually
3 released Plaintiff to return to work.  To the extent that these documents were vaguely written and
4 omitted specific work restrictions, the ALJ gave them limited weight.  He gave "significant weight"
5 to Dr. Caviale's specific work restrictions of January 2010 since these were well supported by
6 associated evidence of partial left extremity limitations.  AR 28.

7 The ALJ gave little weight to Dr. Caviale's medical source statement, however, finding the
8 restrictions set forth, such as limiting Plaintiff only to occasional lifting and carrying under five
9 pounds and requiring hourly rest breaks, to be "significantly overly restrictive."  AR 28.  The ALJ
10 found that no evidence supported restriction of Plaintiff's use of his right hand and that objective
11 medical evidence of limitations of the left hand did not support total preclusion of its use.

12 The ALJ gave "substantially reduced weight" to the two opinions completed by Dr. Rhoades.
13 AR 28-AR 29.  First, he rejected the December 2011 letter opining that Plaintiff's condition was
14 chronic, limiting his performance of the activities of daily living and precluding gainful
15 employment.  In this letter, said the ALJ, Dr. Rhoades impermissibly opined on the ultimate
16 determination of disability, a matter reserved for the Commissioner.

17 Noting that the opinion was inconsistent with the doctor's having released Plaintiff to work at
18 his then-current job, the ALJ gave "substantially reduced weight" to Dr. Rhoades' medical source
19 statement.  The opinion's imposition of bilateral restrictions on Plaintiff's upper extremities was
20 inconsistent with medical evidence showing no upper right extremity impairments.  Further, Dr.
21 Rhoades offered this highly restrictive opinion when Plaintiff was actually working full-time.

22 The ALJ also gave little weight to the initial opinion of the state agency consulting physician
23 (Dr. Quint) who opined that Plaintiff could perform medium work.  He found Dr. Quint's opinion to
24 be overly restrictive in imposing a reaching limitation unsupported by lack of shoulder complaints
25 and continued function of Plaintiff's right upper extremity.  At the same time, the opinion that
26 Plaintiff could perform medium work was entitled to little weight in light of the prolonged and
27 aggressive treatment documented for his left upper extremity.
28 ///

1  Ultimately, the ALJ gave the most weight to the state agency consulting physician's (Dr. Fracchia) reconsideration opinion that Plaintiff was capable of performing light work, occasionally using his left upper extremity to push, pull, handle and finger; occasionally crawling; and never climbing ladders, ropes and scaffolds.  The ALJ found this opinion to be consistent with Plaintiff's left-sided impairments, remaining grip strength with his left hand, and minimal, if inconsistent, range of motion findings.

Questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner.  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).  Since the ALJ's analysis and conclusion were well articulated and supported by substantial evidence in the record, the ALJ did not err in his assessment of the relative credibility of Plaintiff and the various medical experts, nor in his disfavoring the medical source statements of Drs. Caviale and Rhodes.

### III.    Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:    **January 22, 2015**            **/s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE